# United States Court of Appeals
## For the First Circuit

No. 08-1797

UNITED STATES OF AMERICA,

Appellee,

v.

TREVOR CHARLTON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

Mark E. Howard, with whom Kacavas Ramsdell & Howard, PLLC, was on brief for appellant.
Robert E. Richardson, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

April 1, 2010

**TORRUELLA**, <u>**Circuit Judge**</u>. Trevor Charlton ("Charlton"), an African-American, was convicted by a jury of one count of being a felon in possession of a firearm,[1] in violation of 18 U.S.C. § 922(g)(1).[2] The district court enhanced Charlton's sentence pursuant to the Armed Career Criminal Act ("the ACCA"), 18 U.S.C. § 924(e).[3]

---

[1] Specifically, the grand jury charged that, "[o]n or about July 25, 2004, in Brockton in the District of Massachusetts, . . . Charlton . . . [,] having previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess, in and affecting commerce, a firearm, to wit, a Star, Model 30M, 9mm semi[-]automatic pistol, bearing serial number 1878329."

[2] 18 U.S.C. § 922(g)(1) provides:

It shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

[3] 18 U.S.C. § 924(e) provides, in part:

In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

On appeal, Charlton makes two claims.  First, Charlton contends that the empanelment of the jury that convicted him was tainted by racial discrimination in violation of the Constitution and <u>Batson</u> v. <u>Kentucky</u>, 476 U.S. 79 (1986).  Second, Charlton argues that the district court's imposition of the ACCA enhancement violated his Constitutional rights because the government did not plead or prove beyond a reasonable doubt the requisite predicate convictions, nor did Charlton admit those convictions.  Finding that the district court committed no error in granting the government's peremptory strike at issue in this case, we affirm Charlton's conviction.  Furthermore, finding that we are bound by the United States Supreme Court ruling in <u>Almendárez-Torres</u> v. <u>United States</u>, 523 U.S. 224, 226-27 (1998), and our own precedent in <u>United States</u> v. <u>Richards</u>, 456 F.3d 260, 262 (1st Cir. 2006), <u>cert. denied</u>, 550 U.S. 905 (2007), we affirm Charlton's sentence.

## I.  <u>Facts and Procedural History</u>

**A.  Incident (2004) and Indictment (2004)**

As we observed in 2007, when this case was first before us, the events leading to Charlton's arrest are generally undisputed, and their substance is not at issue on this appeal either.  We thus will present these events even more briefly than we did in our prior opinion in this matter.  <u>See</u> <u>United States</u> v. <u>Charlton</u>, 502 F.3d 1, 2-4 (1st Cir. 2007).

-3-

During the evening of July 25, 2004, while investigating a shooting, police in Brockton, Massachusetts found a loaded firearm wrapped in a white shirt on a porch near where Charlton was standing with four other men. Later that night, after first offering various denials, Charlton admitted to the police that he possessed the firearm, owned the white shirt, and had recently stabbed a man.

On September 29, 2004, a grand jury sitting in Boston, Massachusetts, returned a one-count indictment against Charlton, charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

## B. First Trial (2006) and Charlton's Denied Motion to Dismiss (2006)

On March 13, 2006, Charlton's first trial began. Seven days later, on the government's motion and over Charlton's objection, the district court declared a mistrial after the jury repeatedly declared it was deadlocked.

On May 23, 2006, Charlton filed a motion to dismiss the indictment against him on the ground that "further prosecution would violate the Double Jeopardy clause of the Fifth Amendment to the United States Constitution." On June 12, 2006, the district court denied Charlton's motion. United States v. Charlton, 2006 U.S. Dist. LEXIS 97012, at *14 (D. Mass., June 12, 2006). On August 10, 2007, we affirmed. Charlton, 502 F.3d at 6.

-4-

**C. Second Trial -- Jury Selection (2007)**

On December 3, 2007, Charlton's second trial began, and jury selection commenced. Because this was a non-capital felony case, the government possessed six peremptory challenges to prospective jurors and Charlton had ten. See Fed. R. Crim. P. 24(b)(2). Each side also possessed one additional peremptory challenge for the two prospective alternate jurors. See Fed. R. Crim. P. 24(c)(4)(A).

The district court qualified the venire, which consisted of fifty-five potential jurors. The district court and defense counsel argued about the precise number of African-Americans in the jury pool, which defense counsel stated was seven and the district court at one point estimated was twelve.[4]

**1. Peremptory Challenges -- Round One**

The district court proceeded by seating the first twelve potential jurors, which the defense noted included two African-Americans. The government then exercised three of its peremptory challenges, striking Juror No. 23, one of the two African-Americans. Next, the defense exercised five of its peremptory challenges, after which the defense objected to the government's peremptory challenge of Juror No. 23, stating: "she's one of the

---

[4] The district court alternated between saying that its estimate of the number of African-Americans in the jury pool "doesn't even count the Chinese guy and the people with Hispanic surnames" and "included people with Hispanic and Chinese names."

two black jurors seated in the jury, and I think one of the few black jurors in the jury pool." The government attorney, when asked by the district court if he "want[ed] to give a reason for the record," responded: "It has nothing to do with the race, just she's an attorney, and I do not want an attorney on the jury." The district court accepted this explanation and excused Juror No. 23.

## 2. Peremptory Challenges -- Round Two

The district court then seated eight new potential jurors, including one African-American. The defense then exercised two of its five remaining peremptory challenges. The government followed by exercising one of its three remaining peremptory challenges, striking Juror No. 37, the newly called African-American. The defense again objected, stating: "This is the second African-American that's being challenged. Our client is entitled to a fair jury. If she's off, there will be one African-American on the jury, and I'm pressing that." The government, when asked by the district court why he was striking the prospective juror, responded:

> [S]he's a member of the clergy. It has nothing to do with race . . . . Whether she was black, white, Hispanic, Asian, male or female, I'd be challenging her because I think members of the clergy tend to be more sympathetic towards people and less likely to judge them, and I note for the record the first two that I challenged last time happened to be white males.

The district court accepted this explanation, stating: "I do know that, typically speaking, prosecutors challenge clergy.  I mean, that's the way they do it, so I'm not going to call this a black challenge."

After then determining that there was a maximum of two African-Americans in the remaining jury pool,[5] the district court, referring to one of those prospective jurors, asked the government: "She is African-American, and I'm not striking three, so will you withdraw [your peremptory challenge]?"  The government agreed to withdraw its peremptory challenge against Juror No. 37.

---

[5]  It is unclear whether, at this point, there was one African-American remaining in the jury pool, as the defense claims, or two, as the district court and the government seemed to suggest.  The relevant portion of the transcript is as follows:

> THE COURT:  On the other hand, there are two [African-Americans] out there in the pool, at least right now, that I would identify that way . . . .
>
> . . .
>
> MR. RICHARDSON:  -- before we get to it, who else are we calling African-American that's still out there?
>
> THE COURT:  It looks like there are two.
>
> MS. BYRNE:  One of them is his father.
>
> THE COURT: No.  There's one.
>
> . . .
>
> MR. RICHARDSON:  I'm just trying to figure out who they are because if one of them is being counted as African-American and one has a son serving in prison --

### 3. Peremptory Challenges -- Rounds Three Through Six

In the third round, the district court seated two new potential jurors, one of which the defense struck. In the fourth round, the district court seated one new potential juror, which the defense struck. At this point, the defense had one remaining peremptory challenge and, because it had withdrawn its previous peremptory challenge, the government had three. In the fifth round, the district court seated one new potential juror, which the defense struck, exhausting its peremptory challenges.

In the sixth round, the district court seated one new potential juror, Juror No. 43, an African-American. The government exercised one of its three remaining peremptory challenges, striking Juror No. 43. The government, without prompting from the district court, provided the following explanation, to which the defense did not object:

> Your Honor, this is a juror who indicated that she's got a son who went to prison for possession of a firearm. Therefore I'm going to exercise a peremptory as to her. And I just do want to make a record that I understand the Court's position, but for whatever it's worth, I do think it's unfair that the government is precluded, for reasons that have absolutely nothing to do with race, from challenging people that under any other circumstance would be unremarkable anyway. That's why I'm challenging this juror.

At this point, the defense had no remaining peremptory challenges and the government had two.

### 4. Peremptory Challenges -- Final Rounds

The district court then seated the final juror, after which the district court called the first two candidates for the alternate slots. The government exercised its sole peremptory challenge for the two prospective alternate jurors, striking Juror No. 47, who was not African-American. The government, without prompting from the district court, provided the following explanation, to which the defense did not object: "This is the other individual who indicated in this case [that] a[] cousin[,] I believe, is in jail for possession [of a firearm]." Afterwards, the district court seated one new potential alternative juror, to which neither party objected.

Of the twelve jurors who were ultimately empaneled, two -- one of the first twelve prospective jurors to be called from the jury pool and Juror No. 37 -- were African-American.

### D. Second Trial -- Stipulation (2007), Conviction (2007), Sentencing (2008), and Appeal (2008)

At trial, the parties stipulated to the fact that, prior to July 25, 2004, Charlton was convicted of a crime punishable by imprisonment for a term exceeding one year. The jury trial concluded after seven days on December 10, 2007, resulting in the conviction of Charlton.

A presentence investigation report ("PSI report"), dated May 6, 2008, documented Charlton's prior criminal history, including three felony convictions under Massachusetts law.

Concluding that these convictions subsumed either a violent felony or an applicable serious drug offense committed on occasions different from one another, the probation officer who prepared the PSI report recommended that Charlton be sentenced as an armed career criminal -- a classification that would trigger a fifteen-year minimum sentence. 18 U.S.C. § 924(e). Absent that classification, Charlton's total offense level and prior criminal history would have placed him in a lower guidelines sentencing range and, therefore, probably would have yielded a lesser sentence than the district court imposed on him. On June 9, 2008, the district court, observing that Charlton "had quite a few prior convictions," sentenced Charlton to a term of imprisonment of 204 months, sixty months of supervised release, and a $100 special assessment.

Judgment was entered on June 11, 2008. Five days later, Charlton filed his timely notice of appeal. Charlton challenges both the peremptory challenges the government exercised in the process of jury empanelment and the imposition of the ACCA.

## II. Discussion

### A. Batson Challenge

On appeal, Charlton argues that empanelment of the jury that convicted him was tainted by racial discrimination and therefore violated his rights to equal protection of the law under the Fifth Amendment and Batson, 476 U.S. 79 (1986). Charlton

contends that the government's exercise of peremptory challenges "was heavily weighted to exclude African-Americans from the jury." Charlton concedes that the government provided race-neutral explanations for its peremptory challenges. He argues, however, that "those explanations appear pretextual." Consequently, Charlton states, his conviction must be reversed and the matter remanded for a new trial. As discussed below, we find that the district court committed no error in accepting the explanations for the peremptory challenges the government exercised at trial.

### 1.  Background and Framework

The Supreme Court has observed that "a defendant has no right to a petit jury composed in whole or in part of persons of his own race . . . but the defendant does have the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." Batson, 476 U.S. at 85-86 (internal quotation marks omitted) (citing Strauder v. West Virginia, 100 U.S. 303, 305 (1880); Martin v. Texas, 200 U.S. 316, 321 (1906); Ex parte Virginia, 100 U.S. 339, 345 (1880)). As we have previously observed, in the 1986 case of Batson, the Supreme Court "held that the defendant's equal protection rights under the Fourteenth Amendment were violated where jury selection at his trial had been affected by invidious racial discrimination." United States v. Girouard, 521 F.3d 110, 112 (1st Cir. 2008); see also Batson, 476 U.S. at 89 ("[T]he component of the jury selection process at issue

here, the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause. Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.") (internal citations and quotation marks omitted). "Batson applies to proceedings in federal courts under the Fifth Amendment's Due Process Clause." Girouard, 521 F.3d at 112 n.1.

As we have also previously observed, "[t]he Batson framework [for challenging jury composition] requires three steps." Id. at 113; see also Snyder v. Louisiana, 552 U.S. 472, 476 (2008). We have articulated those steps as follows:

> First, the defendant must make a prima facie showing of discrimination in the prosecutor's launching of the strike. If the defendant fulfills this requirement by establishing, say, a prima facie case of a racially driven impetus, then the prosecutor must proffer a race-neutral explanation for having challenged the juror. If the prosecutor complies, then, at the third and final stage, the district court must decide whether the defendant has carried the ultimate burden of proving that the strike constituted purposeful discrimination on the basis of race.

Girouard, 521 F.3d at 113 ("The three-step process attempts to balance the time-honored principle of unfettered exercise of the peremptory challenge with a need to conform trial process to the Constitution."); see also Snyder, 552 U.S. at 476-77.

"The opponent of a strike bears the burden of proof throughout the inquiry." Girouard, 521 F.3d at 113. In order to establish a prima facie case of discrimination, "the moving party must 'raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury' because of their membership in a protected class." Aspen v. Bissonnette, 480 F.3d 571, 574 (1st Cir. 2007) (citation omitted). We have recognized that "the Supreme Court has recently reiterated that the Batson prima facie standard is not onerous." Id. (citing Johnson v. California, 545 U.S. 162, 170 (2005)).

## 2. Standard / Scope of Review

A preserved Batson claim is one in which contemporaneous objection was raised at trial; an unpreserved Batson claim is one in which no such objection was raised at trial. See United States v. Pulgarin, 955 F.2d 1, 1-2 (1st Cir. 1992). "We review preserved Batson claims for clear error, including cases in which the trial court finds no prima facie case of discrimination." Girouard, 521 F.3d at 115; see also Snyder, 552 U.S. at 477. "We will not find clear error unless, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been

-13-

committed." United States v. González-Meléndez, 594 F.3d 28, 35 (1st Cir. 2010) (citation and internal quotation marks omitted). "We . . . apply plain error review to unpreserved Batson claims . . . ." Girouard, 521 F.3d at 115. In applying this standard of review, we have observed a Supreme Court ruling that, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Pulgarin, 955 F.2d at 2 (citing Hernández v. New York, 500 U.S. 352, 360 (1991)).

"We have cautioned those who object to peremptory strikes that they should come forward with facts, not just numbers alone." Girouard, 521 F.3d at 116 (internal quotation marks omitted). Rather, "in considering a Batson objection, or in reviewing a ruling claimed to be Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted." Snyder, 552 U.S. at 478. Those circumstances include both numeric and non-numeric forms of evidence:

> Relevant numeric evidence includes the percentage of strikes directed against members of a particular group, the percentage of a particular group removed from the venire by the challenged strikes, and a comparison of the percentage of a group's representation in the venire to its representation on the jury. Relevant non-numeric evidence includes the striking party's questions and statements during the voir dire, whether the striking party had unused peremptory challenges through which he or she could have eliminated more members of the allegedly targeted group, apparent non-discriminatory reasons for striking potential jurors based on their voir dire answers, and whether similarly situated

-14-

> jurors from outside the allegedly targeted
> group were permitted to serve . . . .

Aspen, 480 F.3d at 577 (internal citations omitted). "We follow this approach of looking at all relevant circumstances even in cases where we are reviewing a district court's finding that no prima facie case has been made." Girouard, 521 F.3d at 115-16.

### 3. Analysis

We consider below both the proper standard / scope of review to employ in this matter, as well as Charlton's specific Batson challenge.

### a. Standard / Scope of Review

Charlton contends that we should review his Batson challenge to the striking of Juror No. 23 for clear error. The government suggests, rather, that we should review Charlton's challenge for plain error. The government supports its argument by observing that Charlton did not renew his challenge when the purported purposeful discrimination became apparent: after the government withdrew its strike of Juror No. 37,[6] and then exercised a peremptory challenge against Juror No. 43. We need not take a position on this matter, as we find that the district court committed no error -- clear or plain -- in denying Charlton's Batson challenge.

---

[6] In its appellate brief, the government refers to "juror number 23" as the prospective juror against which the government withdrew a peremptory challenge. Appellee's Br. at 18. However, it is clear that the government meant Juror No. 37.

-15-

### b.  Charlton's Specific <u>Batson</u> Challenge

Charlton focuses his <u>Batson</u> claim on the government's exercise of a peremptory challenge against Juror No. 23.  At trial, Charlton objected to the striking of Juror No. 23 on <u>Batson</u> grounds.  As discussed below, Charlton has relied entirely on the number of prosecution strikes against African-Americans.  As we have previously held, "[i]t is at least questionable whether this evidence is adequate to surpass the prima facie hurdle."  <u>Aspen</u>, 480 F.3d at 577 (citing <u>United States</u> v. <u>Esparsen</u>, 930 F.2d 1461, 1467 (10th Cir. 1991) ("By itself, the number of challenges used against members of a particular [group] is not sufficient to establish . . . a prima facie case.")) (alteration in original).  But even assuming that Charlton could establish a prima facie case, it is clear that he cannot ultimately establish a <u>Batson</u> violation.

Charlton concedes in his appellate brief that the reason the government offered at trial -- that Juror No. 23 is "an attorney, and I do not want an attorney on the jury" -- "is a sufficient race-neutral explanation for the challenge and, standing alone, would vitiate his argument."  Charlton contends, however, that the totality of the circumstances indicates that "a purpose to eliminate or minimize an African-American presence on the jury can be gleaned, and accordingly Charlton's rights were violated."

To support his totality-of-the-circumstances argument, Charlton points to several developments throughout the process of

-16-

voir dire.  First, Charlton emphasizes that the government exercised "only one" peremptory challenge in the second round in which the district court called prospective jurors when it struck Juror No. 37, the sole newly called African-American.  Second, Charlton points to the fact that the jury that was ultimately empaneled included two African-Americans, "one of whom[, Juror No. 37,] was seated only because the prosecutor withdrew his peremptory challenge in the face of a <u>Batson</u> challenge."  Finally, Charlton notes that the government attempted to exercise three, or fifty percent, of its six peremptory challenges on African-Americans: Juror No. 23, Juror No. 37, and Juror No. 43.  Charlton contends that, although the government withdrew its peremptory challenge against Juror No. 37, "the government's use of half of its challenges to rid, or attempt to rid[,] the jury of three (3) of the four (4) African-Americans who were seated casts a pall over the selection process that amounts to discrimination and undercuts the prosecutor's stated reason for challenging Juror No. 23."

### i.  Relevant Numeric Evidence

Charlton's argument is unavailing given our consultation of all of the circumstances that bear upon the issue of racial animosity.  Although on appeal Charlton focuses his <u>Batson</u> claim on the government's exercise of a peremptory challenge against Juror No. 23, our totality-of-the-circumstances analysis will also

evaluate the government's treatment of other prospective jurors. We begin by considering the relevant numeric evidence.

First, Charlton correctly notes that fifty percent of the government's strikes were directed against members of a particular group, African-Americans. Second, if we take the most conservative estimate of African-Americans in the jury pool, seven, these strikes resulted in three out of seven, or forty-three percent, of a particular group, African-Americans, being removed from the venire. Since only one of these strikes -- against Juror No. 23 -- is directly challenged on appeal, the percentage of a particular group, African-Americans, being removed from the venire by the challenged strike is one out of seven, or fourteen percent.

Third, if we compare the percentage of a group's representation in the venire to its representation on the jury, we find the two percentages to be similar. Again adopting the conservative estimate of African-Americans in the jury pool, we find that African-Americans comprised seven out of fifty-five, or thirteen percent, of the venire, and they comprised two out of twelve, or seventeen percent, of the jury that was ultimately empaneled. The proportion of African-Americans on the empaneled jury was thus actually slightly higher than in the venire.

In submitting this Batson claim concerning Juror No. 23, Charlton appeals to "just numbers alone," precisely what we have cautioned against. See Girouard, 521 F.3d at 116 (citation

omitted).  The government's use of half of its statutorily permitted peremptory challenges to rid, or attempt to rid, the jury of three of the four African-Americans who were seated does not necessarily amount to racial discrimination and does not necessarily undercut the government's stated reason for challenging Juror No. 23.

### ii.  Relevant Non-Numeric Evidence

This finding is further supported by the relevant non-numeric evidence.  First, the government did not ask any questions or make any statements during voir dire that suggested it was operating with racial animosity towards African-Americans.

Second, by the end of voir dire for the prospective jurors, the government had two unused peremptory challenges through which it could have eliminated more members of the allegedly targeted group of African-Americans.  One African-American was seated in the first round of voir dire and the government did not strike or attempt to strike that person at any point during voir dire.  As other circuits have found, this circumstance suggests that the government was not exercising its peremptory challenges in a racially discriminatory manner.  See, e.g., King v. Moore, 196 F.3d 1327, 1335 (11th Cir. 1999) (rejecting a prospective African-American juror "after accepting another black venireperson . . . [indicates] not only was there no pattern of discriminatory strikes, there was a sort of 'antipattern'"); United States v.

Mixon, 977 F.2d 921, 923 (5th Cir. 1992) (in a situation in which "[t]he government used five out of its six challenges against blacks[, t]he one black accepted by the government weakens the argument that the government was accepting jurors solely on a racial basis").

Third, the government offered apparent non-discriminatory reasons for striking potential jurors based on their voir dire answers. The defense concedes on appeal that the explanations the government provided were "race-neutral." The district court accepted each explanation, either implicitly, by not soliciting an explanation and not rejecting the peremptory challenge, or explicitly, by soliciting an explanation and then not rejecting the peremptory challenge. See Girouard, 521 F.3d at 115 (where defense counsel objected on religious grounds to a peremptory challenge and the district court refused to ask the prosecutor for a race-neutral explanation, we interpreted the district court's action "as an implicit rejection of [the defendant's] prima facie case of a Batson violation"). The government stated it struck Juror No. 23 because the prospective juror was an attorney. Other courts have not only permitted such peremptory challenges, but have, sua sponte, declared their obviousness. For example, a district court in the District of Massachusetts, without asking the prosecution to justify a strike against a prospective juror who was an attorney, stated, "[O]ne can think of many reasons why we wouldn't want an

attorney on a criminal case." Id. at 114. The government stated it attempted to strike Juror No. 37 because the prospective juror was a member of the clergy. Other courts have permitted such peremptory challenges. For example, the U.S. Court of Appeals for the Fifth Circuit found to be race-neutral the government's peremptory challenge of an African-American prospective juror who indicated that she and her husband were ordained ministers and the government inferred that she might have a higher threshold of reasonable doubt. Mixon, 977 F.3d at 923. The government stated it struck Juror No. 43 because the prospective juror had a son in prison for a crime similar to the one charged against Charlton: possession of a firearm. The defense did not object to the peremptory challenge against Juror No. 43 at the time but cites the strike on appeal as part of the totality of the circumstances that indicate that the government intended "to eliminate or minimize an African-American presence on the jury." However, other circuits have upheld similar juror dismissals. See, e.g., United States v. Hendrix, 509 F.3d 362, 370 (7th Cir. 2007) (finding "a valid and race-neutral basis for the strikes" where prosecution exercised peremptory challenges against three jurors, all of whom had relatives in prison); United States v. Crawford, 413 F.3d 873, 875 (8th Cir. 2005) ("There is no Batson violation when a juror is dismissed because the juror's relatives have been prosecuted or convicted of a crime . . . .").

Finally, there is no evidence in the record that similarly situated jurors (attorneys, members of clergy, or relatives of convicts) from outside the allegedly targeted group of African-Americans were permitted to serve. In fact, the government was consistent when, according to the trial transcript, the only other similarly situated prospective juror, Juror No. 47, who stated she had a relative in jail for possession of a firearm, was considered as an alternate juror. As with Juror No. 43, the government exercised a peremptory challenge against this prospective (alternate) juror, offering the same explanation in the process, notwithstanding that Juror No. 47 was not African-American.

Having consulted all of the circumstances that bear upon the issue of racial animosity, we conclude that Charlton failed to establish that the government purposely discriminated against African-Americans in exercising its peremptory challenge against Juror No. 23 and thus the district court committed no error -- clear or plain -- in permitting the government's peremptory challenge against that prospective juror. Furthermore, we are not left with the definite and firm conviction that the district court made a mistake in deciding that Charlton failed to prove that the strike constituted purposeful discrimination on the basis of race. We have not determined an inherent discriminatory intent in the government's explanation for striking Juror No. 23, and so deem the

reason offered -- that she was an attorney and the government did not want an attorney on the jury -- to be race-neutral. Thus, contrary to Charlton's contention, we glean no purpose by the government to eliminate or minimize an African-American presence on the jury.

## B. Predicate Convictions

Charlton was convicted of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) and subsequently sentenced under the provisions of the ACCA. On appeal, Charlton argues that his Sixth Amendment right to trial by jury was violated because the government did not plead or prove beyond a reasonable doubt the requisite predicate convictions, nor did Charlton admit to those convictions. Consequently, Charlton states, his sentence must be vacated and the matter remanded for resentencing. "We have consistently rejected this argument in light of Supreme Court precedent." United States v. LaFortune, 520 F.3d 50, 58 (1st Cir. 2008). As discussed below, because of the Supreme Court's and our own precedent on this matter, we must uphold Charlton's sentence. See Richards, 456 F.3d at 262.

On appeal, Charlton acknowledges that we have characterized as "hopeless" claims

> that the Fifth and Sixth Amendments precluded the district court from classifying [appellant] as an armed career criminal because (i) the indictment did not charge him as an armed career criminal and (ii) [appellant] did not admit -- nor did a jury

-23-

find -- that [appellant's] prior crimes qualified as predicate offenses under the ACCA.

Id. Charlton's characterization is accurate. "[A] sentencing enhancement may be grounded on prior criminal convictions neither separately charged nor proven to a jury." Id. (citing Almendárez-Torres, 523 U.S. at 226-27). "[T]his court normally is bound by a Supreme Court precedent unless and until the Court itself disavows that precedent. For that reason, we recently have rejected a parade of similarly sculpted challenges to the continuing vitality of Almendárez-Torres [in the context of the ACCA]. We reiterate those holdings today." Id. (internal citations omitted).

We conclude that the district court did not err in sentencing Charlton as an armed career criminal.

### III. **Conclusion**

We find no error in the district court's granting of the government's peremptory strike against Juror No. 23. We are bound by precedent in rejecting Charlton's ACCA claim. Charlton's conviction and the district court's sentence are thus both affirmed.

**Affirmed**.

**"Concurring opinion follows"**

-24-

**LYNCH, <u>Chief Judge</u>, concurring.** Sometimes the whole can be greater than the sum of the parts, including in <u>Batson</u> cases. I write separately to emphasize that the defendant's underlying theory is sound, though little help to him here. Even if the prosecution offers facially neutral reasons for striking individual members of protected groups at the time of the strike, if those strikes together later create a concern that certain groups are underrepresented, it may well make sense for a trial judge to take a second look at the exclusions.

<u>Batson</u> and its progeny are not ultimately about statistical disparities or disparate impact; they are about animus. See <u>Snyder</u> v. <u>Louisiana</u>, 552 U.S. 472, 478 (2008). Determining when a party acted with discriminatory purpose when exercising its peremptory challenges with is never easy and is not well suited for bright-line rules. See <u>Miller-El</u> v. <u>Dretke</u>, 545 U.S. 231, 238-40 (2005). The Supreme Court's recent jurisprudence reminds courts to consider "all of the circumstances that bear upon the issue of racial animosity." <u>Snyder</u>, 552 U.S. at 478; <u>see</u> <u>also</u> <u>Miller-El</u>, 545 U.S. at 240 ("If any facially neutral reason sufficed to answer a <u>Batson</u> challenge, then <u>Batson</u> would not amount to much more than <u>Swain</u>. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand.").

-25-

But objections based solely on numerical effects are inherently problematic. Although courts may consider statistics as evidence of discrimination, Miller-El, 545 U.S. at 240-41, the Supreme Court has not accepted the proposition that a showing of disparate impact alone meets the Batson requirement, see Hernandez v. New York, 500 U.S. 352, 362 (1991) (plurality opinion) ("An argument relating to the impact of a classification does not alone show its purpose.").

Relying only on statistics to uncover discriminatory intent can be over- or underinclusive. Prosecutors often exercise peremptories against a series of minority jurors for valid, nondiscriminatory reasons. And no matter how many or how few minority jurors the government strikes, "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." Snyder, 552 U.S. at 478 (quoting United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)).

Frequently in life, later, related events have explanatory power as to what happened earlier. Thus an explanation for a strike that seems minimally adequate at the time may look more suspect in light of later challenges. The cumulative impact of a series of peremptories is one of many facts courts can consider when interpreting a prosecutor's motives.

Here, the defendant has no more than numbers, as Judge Torruella's opinion clearly explains. The other facts do not show

-26-

that the government acted with animus.  The government exercised two peremptories to which Charlton objects, first against an attorney and then, initially, against a clergymember.  In the end, the prosecution decided, after it looked at the assembled jurors, not to strike Juror No. 37 (the clergymember), which removed any suspicion of a <u>Batson</u> violation from the case.  While the defendant's case has been ably argued, there was no error.